**FILED**

AO 91 (Rev. 11/11) Criminal Complaint

AUSAs Richard M. Rothblatt (312) 353-4558 & Barry Jonas (312) 886-8027

EC JUL 18 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

BRITTNEY STOKES, and
KENNETH NINALOWO

CASE NUMBER:

**19 CR 586**

**UNDER SEAL**   MAGISTRATE JUDGE COX

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Starting no earlier than in or about June 2016 and continuing until in or about February 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____

RALPH RENNO
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: July 18, 2019

_____
*Judge's signature*

City and state: Chicago, Illinois

Susan E. Cox, U.S. Magistrate Judge
*Printed name and Title*

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, RALPH E. RENNO, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since approximately October 1991. My current responsibilities include the investigation of white-collar crime, including mail, wire, bank fraud, and money laundering offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that BRITTNEY STOKES and KENNETH NINALOWO have violated Title 18, United States Code, Section 1956(h) (money laundering conspiracy). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging STOKES and NINALOWO with money laundering conspiracy, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3. The statements made in this affidavit are based, in part, on my personal knowledge, my review of financial records, interviews of witnesses, my own observations and actions, physical surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents.

## FACTS SUPPORTING PROBABLE CAUSE

### Summary

4.     The FBI is investigating individuals operating out of the Chicago area engaged in fraud and money laundering through the use of email spoofing.  The individual or individuals responsible for this scheme (a spoofer or spoofers) sent emails from an email address purposely created to make the email appear as if it were coming from a company that has a legitimate business relationship with the victim entity receiving the email message.  The email address and the content of the emails led the victim entities to believe that the emails were legitimate business related emails. As a result, the spoofer(s) caused victim entities to wire millions of dollars of funds to bank accounts controlled by the spoofer(s) or their associates. BRITTNEY STOKES thereafter attempted to deposit the fraudulently-obtained proceeds of two of these victims (College A and Energy Company A) into bank accounts that she had setup.  From those accounts, STOKES and NINALOWO withdrew and transferred hundreds of thousands of dollars, knowing that the proceeds were derived from some form of unlawful activity.

I.     STOKES and NINALOWO Launder Approximately $398,220 of $3.3 Million in Proceeds Fraudulently Obtained from College A

a.     *Spoofer(s) Defraud College A and Direct Victim to Send $3.3 Million to Spoofer Bank Account 1*

5.     College A is a large community college serving over 15,000 students and is located in the Northern District of Illinois.  College A has an ongoing contract with Construction Company A, which is based out of Minneapolis, Minnesota, for various

ongoing construction projects on the campus of the college. Legitimate emails from the Construction Company use the email structure of "[name]@[Construction Company A].com."

6.    I have reviewed numerous emails related to this investigation that were voluntarily provided by College A to FBI agents. On or about June 9, 2016, at approximately 1:17 p.m., an individual using the email address "ynguyen@[Construction Company A]company.com" (the "First Spoofing Email Address") sent an email to a College A payroll accounts department employee. The individual using the First Spoofing Email Address represented his or herself as "Yvonne Nguyen," a Group Accounting Manager from the Construction Company A.[1] In this email, "Nguyen" stated: "Hi, Please see attached for our new ACH details," and then signed the email "Regards, Yvonne Nguyen, Group Accounting Manager."[2] The email also indicated that there was an attachment, however, no attachment was included with the email. As a result, the payroll accounts department employee replied to the email advising that the attachment was missing.

---

[1] According to officials at Construction Company A, there was no employee named "Yvonne Nguyen" at Construction Company A. Further, law enforcement officials understand that "Yvonne Nguyen" was a pseudonym used by the spoofer(s) and not a real person.

[2] Some of the email messages have been summarized in this Affidavit. The language that is quoted from the emails throughout this Affidavit is based upon a preliminary review of the emails. The times listed for the emails are approximate. The summaries do not include all statements or topics covered during the course of the emails. At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the emails. My interpretations are based on the contents and context of the emails, events occurring before and after the emails, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

7.   While "Nguyen" represented in this email that she was the Group Accounting Manager of the Construction Company A, the First Spoofing Email Address that she used to send the email did not follow the email structure for legitimate emails coming from the Construction Company A. Whereas proper emails from Construction Company A included the extension "@[Construction Company A].com," the extension used in the First Spoofing Address was "@[Construction Company A]company.com."

8.   According to query of a public database that allows users to ascertain when a domain or website was registered and where it is currently being hosted, on or about June 9, 2016 – the same day that "Nguyen" first used the First Spoofing Email Address to contact College A – an individual or individuals created the domain associated with the First Spoofing Email Address, namely, "www.[Construction Company A]company.com."[3]

9.   On or about June 9, 2016, at approximately 3:35 p.m., "Nguyen," using the First Spoofing Email Address, sent another email to College A, attaching a legitimate College A form typically used by vendors to supply banking information to obtain payment for services.  The email sent by "Nguyen" provided: "Hi [College A

---

[3] According to this same database, "www.[Construction Company A]company.com" was hosted on a computer server assigned to an internet protocol ("IP") address that resolves to a hosting company named Gandi SAS, which is located in Paris, France.  The IP address of that server is 217.70.184.38.  As discussed below, considering that the account holders who made withdrawals of cash disbursed as a result of the fraud lived in Chicago and Atlanta, I believe that the spoofer(s) may be using a Virtual Private Network or VPN.  A VPN extends a private network to a public network and enables users to send and receive data, including emails, across shared or public networks as if their networks were directly connected to the private network.  Use of a VPN enables the user of the network to mask the internet protocol address of the original network to which the user is connected.

payroll accounts employee], See attached, Thanks." The attached form contained Construction Company A contact information that all appeared legitimate. The form also included a new bank routing number and account number ("Spoofer Bank Account 1").

10.     According to a representative of College A ("Individual A"), because everything on the form appeared to be legitimate, the payroll accounts department employee changed the banking information in College A's system to direct future payments for Construction Company A services to Spoofer Bank Account 1.

11.     On or about June 10, 2016, at approximately 10:06 a.m., the payroll accounts department employee received another email from the First Spoofing Email Address. The email provided: "Hi [College A payroll accounts employee], Thanks for the swift response yesterday. Kindly update me once the changes have been made. Regards." The payroll accounts department employee did not reply to this email.

12.     According to records provided by College A, on or about June 20, 2016, an employee of College A approved a routine payment of $3,371,291 from College A's bank, Bank of America, to Construction Company A. On or about June 29, 2016, College A disbursed the payment to the new bank account provided by the spoofer who controlled the First Spoofing Email Address (Spoofer Bank Account 1).

        b.      *Proceeds of Fraud Transferred to Steno Logistics*

13.     According to records provided by Bank of America, Spoofer Bank Account 1 was registered to "[Individual B] Consulting LLC." According to records provided by Bank of America, Spoofer Bank Account 1 was opened in or around

February 2015 with a registration address listed in Atlanta, Georgia ("Spoofer Bank Account 1 Address"). According to a database that, in my experience, analyzes numerous records from various data sources, including financial and governmental institutions, to provide accurate identifying information regarding individuals ("Records Database"), Individual B was reported as residing at Spoofer Bank Account 1 Address from approximately February 2015 to October 2015. However, this same inquiry revealed that between approximately February 1996 and January 2017, Individual B also held a residence in Guam. According to representatives of both College A and Construction Company A, Individual B is not employed by and has no association with either entity.

14. According to the Records Database, the resident at Spoofer Bank Account 1 Address from approximately September 2015 to January 2018 was Individual C. According to that same database, Individual C lived in the Chicago area from as late as approximately February 1994 through July 2016. According to representatives of both College A and Construction Company A, Individual C is not employed by and has no association with either entity.

15. On or about June 30, 2016, Spoofer Bank Account 1 received the approximately $3.3 million in cash from College A and almost immediately after the deposit, various attempts were made to cash or deposit checks drawn on the account. The checks were made payable to numerous individuals or companies, and many

checks were in increments just below $10,000.[4]  Based on the various attempts to cash or deposit checks drawn on the account and many of the amounts being just under $10,000, Bank of America froze Spoofer Bank Account 1 and associated accounts.  Once frozen, there was in excess of $3 million remaining in Spoofer Bank Account 1.  The funds frozen in Spoofer Bank Account 1 were returned to College A.

16.    According to records obtained from Bank of America, 11 checks were sent from Spoofer Bank Account 1 to 11 different individuals and entities in amounts ranging from $9,060 to $398,220.[5]  Most checks were negotiated in Chicago and Atlanta.  One of the 11 checks written from Spoofer Bank Account 1 was made out to "Steno Logistics" in the amount of $398,220.

c.    *Steno Logistics and BRITTNEY STOKES*

17.    According to a search of the Illinois Secretary of State website for corporation file details, Steno Logistics was first registered as a corporation in Illinois on or about June 8, 2016 – one day before "Nguyen" first contacted College A on behalf of the spoofer(s), and one day before the domain that hosted the First Spoofing Email Address was first created.  The listed agent for Steno Logistics was "BRITTANY STOKES" and the listed address for the agent was STOKES Address 1.[6]  Based on

---

[4] Law enforcement possess surveillance photographs from bank video of several individuals who deposited or attempted to deposit checks from Spoofer Bank Account 1, in addition to those described below.

[5] According to records from Bank of America, 6 of the 11 checks did not clear because there was an insufficient balance in Spoofer Bank Account 1.

[6] Law enforcement officials understand that, during this time period, STOKES Address 1 was BRITTNEY STOKES's home residence.  On or about December 7, 2016, law enforcement officials conducted surveillance of STOKES at her former place of employment, Menards, in

information provided by employees at Menards and agent surveillance, law enforcement authorities understood that STOKES was, at that time, the First Assistant to the Manager at a branch of Menards, a home improvement store. The listed President of Steno Logistics was Individual D. According to a database that, in my experience, analyzes numerous records from various data sources, including financial and governmental institutions, to provide accurate identifying information regarding individuals, Individual D is STOKES's mother.

18. According to information provided by Bank of America, on or about June 15, 2016 – less than a week after "Nguyen" first contacted College A on behalf of the spoofer(s), and approximately two weeks before College A disbursed the $3.3 million payment due Construction Company A to Spoofer Bank Account 1 – STOKES opened up a bank account in the name of Steno Logistics at a Crestwood location of Bank of America (the "First Steno Logistics Account"). These bank records listed STOKES as the President/Secretary for Steno Logistics and included the Articles of

---

Crestwood, Illinois. Law enforcement officials identified STOKES as follows: (1) STOKES was wearing a nametag bearing her name; and (2) law enforcement officials reviewed STOKES's Illinois driver's license photograph and determined that the individual working in Menards was the same person depicted in the photograph. During surveillance, law enforcement officials observed STOKES exit Menards and get into a black 2014 Mercedes, which, according to Illinois Secretary of State records, was registered to "BRITTANY STOKES" at STOKES Address 1. In addition, according to personnel information provided by Menards, STOKES's listed address was STOKES Address 1. Finally, law enforcement officials performing surveillance have observed STOKES at STOKES Address 1 on several occasions. During the course of the investigation, law enforcement officials learned that, on or about December 15, 2017, STOKES purchased a new residence ("STOKES Address 2").

Based on a review of bank records, Illinois Secretary of State records, and records provided by Google, among others, law enforcement officials understand that STOKES spells her name both as "Brittany" and "Brittney."

Incorporation for Steno Logistics and STOKES's Illinois driver's license. The only name listed as authorized to transact business on or withdraw money from the First Steno Logistics Account was STOKES.

19.     On or about July 5, 2016, approximately six days after College A sent the fraudulent payment to Spoofer Bank Account 1, STOKES deposited the $398,220 check made out to Steno Logistics from Spoofer Bank Account 1 at a Bank of America in Crestwood.[7]

20.     On or about December 7, 2016, law enforcement officials interviewed the Bank of America teller who accepted the deposit from STOKES. The teller identified STOKES by reviewing her Illinois driver's license photograph and said that she was the same individual who deposited the $398,220 check. According to the teller, STOKES said that Steno Logistics was a trucking company that made deliveries from business to business, but that she was not a driver for the company. The teller did not recall seeing STOKES in Bank of America again after the deposit of the check.

21.     According to officials at Bank of America, following STOKES's deposit of the $398,220 check, Bank of America filed a report to document possible fraudulent activity. Soon after, Bank of America shut down the First Steno Logistics Account.[8]

---

[7] Agents were able to identify STOKES as the individual depositing the $398,220 check made out to Steno Logistics from Spoofer Bank Account 1 as follows: the deposit of the check was video recorded. Based on their review of the surveillance video, review of STOKES's Illinois license photograph, and agent surveillance, law enforcement officials were able to identify STOKES in the surveillance video.

[8] According to records from Bank of America, by the time of STOKES's deposit of the $398,220 check from Spoofer Bank Account 1, activity in the First Steno Logistics Account was limited to a $100 credit on June 15, 2016, an $18,098 credit on June 28, 2016, and several large cash

22.     Based on my training and experience and knowledge of the investigation – including: (a) the timing of the registration of Steno Logistics, which was one day before "Nguyen" first contacted College A on behalf of the spoofer(s) and one day before the domain that hosted the First Spoofing Email Address was first created; (b) the timing of the setup of the First Steno Logistics Account, which was six days after "Nguyen" first contacted College A on behalf the spoofer(s) and five days after the domain that hosted the First Spoofing Email Address was first created; (c) as discussed below, the use of the Second Steno Logistics Account in connection with the receipt of additional fraudulent funds in February 2018; and (d) the fact that a check for $398,220 of fraud proceeds from Spoofer Bank Account 1 was made payable to Steno Logistics and STOKES deposited the check into the First Steno Logistics Account – I believe that:

a.     either STOKES or an individual acting at her direction registered a fictitious company called "Steno Logistics" and the First Steno Logistics Account for the purpose of obtaining proceeds fraudulent obtained from College A and others;

b.     STOKES knew that the proceeds funding the $398,220 check from Spoofer Bank Account 1 were derived from some form of unlawful activity; and

c.     STOKES registered Steno Logistics, opened the First Steno Logistics Account, and deposited the $398,220 check from Spoofer Bank Account 1 into the First Steno Logistics Account in order to conceal and disguise the nature, the

---

withdrawals and wires between June 28, 2016 and June 30, 2016. Two wires totaling approximately $6,600 in funds went to another account associated with STOKES (as discussed below, the Second Steno Logistics Account).

location, the source, the ownership, and the control of the proceeds fraudulently obtained from College A.

II.    **STOKES and NINALOWO Launder Approximately $1.3 Million of $1.7 Million in Proceeds Fraudulently Obtained from Energy Company A**

        a.    *Spoofer(s) Defraud Energy Company A and Direct Energy Company A to Send Approximately $1.7 Million to Second Steno Logistics Account*

23.    Energy Company A was an energy exploration company and was located in Irving, Texas. Energy Company B was an energy company, located in Houston, Texas, that provided energy to Energy Company A.

24.    I have reviewed numerous emails related to this investigation that were voluntarily provided by Energy Company A to FBI agents. On or about December 27, 2017, at approximately 4:47 p.m., an individual purporting to be a real Energy Company B employee (the "real Energy Company B Employee") sent an email to three employees at Energy Company A with the subject "ACH Update." The email provided: "We recently received a payment from your company and noticed that payments are still being made to our old bank. We have switched banks. I will be forwarding you updated banking details once I have your confirmation. I have also attached our W9 for your perusal."

25.    Following the transfer of $1.7 million to accounts associated with STOKES, discussed below, representatives from Energy Company B performed an internal review of the real Energy Company B Employee's email account and the emails discussed above and below. According to a representative of Energy Company B:

a. For a period of time, the real Energy Company B Employee's email account was being controlled by a spoofer (the "Energy Company B Spoofer").

b. The Energy Company B Spoofer setup rules and filters so that all emails sent to the real Energy Company B Employee would be sent to a different email address operated by the spoofer.[9]

c. The Energy Company B Spoofer then was able to send emails as the real Energy Company B Employee, pretending to be the real Energy Company B Employee.

d. The December 27, 2017 email discussed above and all of the emails discussed below purporting to have been sent by the real Energy Company B Employee were actually sent by the Energy Company B Spoofer.

26. On or about January 3, 2018, at approximately 3:33 p.m., one of the Energy Company A employees who received the December 27, 2017 email from the Energy Company B Spoofer responded to the Energy Company B Spoofer. The Energy Company A Employee wrote: "Hi [real Energy Company B Employee]. There was not banking information attached. Please forward me the document and I will update your banking [the account to which Energy Company A will send future payments due Energy Company B]."

---

[9] According to information provided by Company C, email to the Energy Company B employee's email address was forwarded to the Energy Company B Spoofer's email address (the "Energy Company B Spoofer Email Address"). According to information provided by Google, some IP login information for the Energy Company B Spoofer Email Address related to IP addresses in Lagos, Nigeria, while others appeared to be using a VPN.

27.     Approximately three hours later, at 6:23 p.m., the Energy Company B Spoofer responded with an attachment reflecting new bank account information for wirings and said: "Please see new bank details attached."  The attachment reflected a bank account at TD Bank ending in 9303 (the "Fraudulent TD Bank Account").

28.     On or about January 4, 2018, between approximately 7:09 a.m. and 7:45 a.m., the Energy Company A Employee exchanged a series of emails with the Energy Company B Spoofer.  During this exchange, the Energy Company A Employee asked: "Can you please verify the remit to address?"  The Energy Company B Spoofer responded: "Remit to address [email address of Energy Company B Employee, which Energy Company B Spoofer was controlling]."  The Energy Company A Employee wrote: "I'm sorry I need the physical address I am trying to make sure I have the correct vendor number."  The Energy Company B Spoofer responded with a real and accurate address for Energy Company B.  The Energy Company A Employee then wrote: "Thank you it [the banking information for Energy Company B] will be changed today."

29.     According to a representative of Energy Company A, because everything on the forms submitted and emails sent by the Energy Company B Spoofer appeared to be legitimate, the Energy Company A Employee changed the banking information in Energy Company A's system to direct future payments for Energy Company B to the Fraudulent TD Bank Account.

30.     According to records provided by Energy Company A and bank records from TD Bank, on or about January 9, 2018, Energy Company A issued a payment of

approximately $97,729.65 to the Fraudulent TD Bank Account. On or about January 11, 2018, Energy Company A issued two payments of approximately $239,563.13 and $164,754.84 to the Fraudulent TD Bank Account.

31.     On or about January 11, 2018, at approximately 1:02 p.m., the Energy Company B Spoofer sent another email to the Energy Company A Employee. The Energy Company B Spoofer wrote: "We received a payment notification yesterday from [Energy Company A] . . . We are yet to confirm receipt of this [sic] funds in our TD bank account [the Fraudulent TD Bank Account]. Can you verify that payments were sent to our account number ending in xx9303 [the Fraudulent TD Bank Account]?" At approximately 1:18 p.m., the Energy Company A Employee responded: "I show a payment that went before the payment on the 10th it was one on the 8th."

32.     On or about January 17, 2018, the Energy Company B Spoofer sent an email to the Energy Company A Employee. The Energy Company B Spoofer wrote: "We noticed that the below ACH payments [electronic money transfers via the Automated Clearing House network] . . . did not hit our account [the Fraudulent TD Bank Account], our bank informed us that this was due to our account still being setup. As such, we request that you kindly send payments to below bank account." The Energy Company B Spoofer then provided account information for a bank account at Chase Bank ending in 1612 (the "Second Steno Logistics Account").

b.     *STOKES and the Second Steno Logistics Account*

33.     According to information provided by Chase Bank, on or about June 18, 2016 – less than a week and a half after the spoofer(s) first contacted College A in

connection with the wire payment fraud discussed above, and only three days after STOKES first opened the First Steno Logistics Account with Bank of America – STOKES or someone acting in concert with STOKES opened up the Second Steno Logistics Account in the name of Steno Logistics at a Chase Bank branch in an Alsip, Illinois. These bank records listed STOKES as the President of Steno Logistics and included the Articles of Incorporation for Steno Logistics and STOKES's Illinois driver's license. The only name listed as authorized to transact business on or withdraw money from the Second Steno Logistics Account was STOKES.[10] The signatory for the Second Steno Logistics Account was "BRITTNEY STOKES."

34. According to representatives of both Energy Company A and Energy Company B, STOKES has never been employed by nor associated with either company. According to representatives from Menards, STOKES was employed by Menards until on or about January 10, 2018, which was around the time that the Energy Company B Spoofer fraudulently diverted Energy Company A's payments to the Second Steno Logistics Account.

       c.     *Energy Company A Transfers Approximately $1,685,699 into the Second Steno Logistics Account*

35. Between January 26, 2018 and February 8, 2018, as a result of Energy Company B Spoofer's January 17, 2018 email directing Energy Company A to send all payments due to Energy Company B to the Second Steno Logistics Account, Chase Bank records show that Energy Company A transferred a total of approximately

---

[10] As discussed below, KENNETH NINALOWO transacted business from the Second Steno Logistics Account by withdrawing funds and writing at least one check from the account.

$1,685,699 to the Second Steno Logistics Account over the course of multiple wire transfers. Specifically, Energy Company A transferred the following amounts to the Second Steno Logistics Account on the following dates:

- $22,054.17 on or about January 26, 2018;

- $35,000 on or about January 30, 2018;

- $833,672.50 on or about February 2, 2018;

- $608,488.90 on or about February 6, 2018; and

- $186,483.73 on or about February 8, 2018.

      d.    *STOKES and NINALOWO Promptly Withdraw and Transfer Approximately $1.3 Million in Proceeds from the Energy Company A Fraud Out of the Second Steno Logistics Account*

36.    Between January 26, 2018 and February 8, 2018, STOKES and NINALOWO withdrew and transferred approximately $1.3 million out of the nearly $1.7 million that Energy Company A had deposited into the Second Steno Logistics Account. According to bank records for the Second Steno Logistics Account:

      a.    On or about January 25, 2018, the balance of the Second Steno Logistics Account was approximately $60,285.90.[11]

      b.    Within three days of Energy Company A's January 26, 2018 transfer of $22,054.17 to the Second Steno Logistics Account, STOKES or someone

---

[11] Law enforcement officials understand that the Second Steno Logistics Account had a preexisting balance before received the fraudulently-obtained funds from Energy Company A on January 26, 2018. As discussed below, over the weeks to follow, STOKES and NINALOWO withdrew nearly $1.3 million from this account – far more than the preexisting balance and all but roughly $60,000 coming from Energy Company A.

acting under her authority (such as NINALOWO)[12] moved approximately $79,550 out of the Second Steno Logistics Account in the form of withdrawals and wires. Specifically, on or about January 26, 2018, STOKES or someone acting under her authority (such as NINALOWO) wired $20,000 to a bank account in the name of Airway Auto (the "Airway Auto Account"). Law enforcement officials understand that NINALOWO is associated with the Airway Auto Account.[13]

        c.    Within two days of Energy Company A's January 30, 2018 transfer of $35,000 to the Second Steno Logistics Account, STOKES or someone acting under her authority (such as NINALOWO) moved approximately $35,500 out of the Second Steno Logistics Account in the form of debit card transactions, withdrawals, and wires.

        d.    Within three days of Energy Company A's February 2, 2018 transfer of $833,672.50 to the Second Steno Logistics Account – and as discussed in detail below – STOKES or someone acting under her authority (such as NINALOWO) moved approximately $635,700 from the Second Steno Logistics Account by

---

[12] As discussed below, on February 5, 2018, KENNETH NINALOWO, wrote a $50,000 check from the Second Steno Logistics Account to Individual E and discussed that check with STOKES. Accordingly, I believe that NINALOWO had access to the Second Steno Logistics Account.

[13] The Airway Auto Account is a bank account at First Midwest Bank. Based on records from First Midwest Bank, the signatory for the Airway Auto Account is Individual F. On or about October 3, 2018, surveillance video of a Bank of America branch in Chicago depicted NINALOWO depositing a check for $73,200 into another account in the name of Airway Auto (the "Airway Auto Account 2"). Based on records from Bank of America, the signatory on the Airway Auto Account 2 is also Individual F. Law enforcement officials identified NINALOWO in the surveillance video based on comparing an image from the surveillance video to a photograph of NINALOWO from his Illinois driver's license, which agents pulled from the Illinois Secretary of State.

withdrawing cash, writing checks, and wiring funds to other bank accounts, including two accounts controlled by STOKES (the Yummy Bear Day Care Account and the Chase STOKES Account, both of which are discussed further below).

e.     Within one day of Energy Company A's February 6, 2018 transfer of $608,488.90 to the Second Steno Logistics Account, STOKES or someone acting under her authority (such as NINALOWO) moved approximately $356,555 out of the Second Steno Logistics Account in the form of debit card transactions, checks, withdrawals, cashier's checks, and a wire transfers to various individuals and entities.

f.     On the same day of Energy Company A's February 8, 2018 transfer of $186,483.73 to the Second Steno Logistics Account, STOKES or someone acting under her authority (such as NINALOWO) moved approximately $266,251.31 out of the Second Steno Logistics Account in the form of debit card transactions, withdrawals, and wire transfers to various individuals and entities.

i.     *STOKES Transfers $180,000 in Energy Company A Fraud Proceeds from the Second Steno Logistics Account to the Yummy Bear Day Care Account, then Attempts to Transfer $100,000 of those Proceeds to NINALOWO*

37.     According to records provided by Citibank for the Yummy Bear Day Care Account, on or about February 2, 2018 – and following Energy Company A's Transfer of $833,672.50 to the Second Steno Logistics Account on February 2, 2018 – STOKES wrote a check for $180,000, made payable to "Yummy Bear Day Care Center," from the Second Steno Logistics Account. Law enforcement authorities obtained a copy of the February 2, 2018 check, which was endorsed on the back by

"Yummy Bear Day Care Center." Citibank records show that the check was deposited the same day into a Citibank account ending in 8021 and registered to "Yummy Bear Day Care Center Inc." (the "Yummy Bear Day Care Account").

38.     According to Citibank records, STOKES opened the Yummy Bear Day Care Account on or about October 24, 2017, listing STOKES Address 1 as the account's address of record.  The record further identified STOKES as the only individual authorized to transact business on the account.

39.     According to records maintained by the Illinois Secretary of State, Yummy Bear Day Care Center Inc. was registered with the State of Illinois on or about February 20, 2017.  The listed agent was "BRITTNEY STOKES" and the address was STOKES Address 1.  The records listed the corporation's status as "not good standing."  Based on my training and experience, I know that a corporation is "not [in] good standing" if it has failed to comply with the Illinois' requirements for reporting and paying fees.

40.     According to records provided by Citibank, on or about February 6, 2018, one day after STOKES transferred approximately $180,000 of the funds obtained from Energy Company A to the Yummy Bear Day Care Account, STOKES or someone acting under her authority (such as NINALOWO) attempted to wire funds in the amount of approximately $100,000 from the Yummy Bear Day Care Account to a United Bank for Africa PLC account ending in 9352 in the name of "KENNETH NINALOWO" in Nigeria.  At that time, Citibank halted the transfer and froze the Yummy Bear Day Care Account.

> ii.      *NINALOWO Withdraws Cash Proceeds of the Energy*
> *Company A Fraud from the Second Steno Logistics*
> *Account*

41.     Between February 3 and 6, 2018 – and following Energy Company A's Transfer of $833,672.50 to the Second Steno Logistics Account on February 2, 2018 – NINALOWO performed numerous cash withdrawals from the Second Steno Logistics Account.  Specifically:

a.      On or about February 3, 2018, at approximately 9:56 a.m., surveillance video of a Chase branch in Chicago captured NINALOWO withdrawing approximately $3,000 from the Second Steno Logistics Account.

b.      On or about February 5, 2018, at approximately 11:42 a.m., surveillance video of the same Chase branch in Chicago captured NINALOWO withdrawing another approximately $3,000 from the Second Steno Logistics Account.

c.      On or about February 6, 2018, at approximately 11:40 a.m., surveillance video of the same Chase branch in Chicago captured NINALOWO withdrawing another approximately $3,000 from the Second Steno Logistics Account.

> iii.     *NINALOWO and STOKES Write $50,000 Check from the*
> *Second Steno Logistics Account, Drawing on Proceeds of*
> *the Energy Company A Fraud*

42.     In addition to his cash withdrawals from the account, NINALOWO also wrote at least one check drawing on the fraudulently obtained funds in the Second Steno Logistics Account.  According to bank records for the Second Steno Logistics Account, on or about February 5, 2018, STOKES purportedly wrote a check for $50,000 made payable to Individual E from the Second Steno Logistics Account.  The

check was purportedly signed by STOKES, but subsequently seized messages between NINALOWO and STOKES (discussed below) revealed that NINALOWO signed this check on STOKES's behalf.

43.     Specifically, between February 5, 2018, at approximately 4:31 p.m., and February 7, 2018, at approximately 10:56 a.m., STOKES, using Stokes Phone 1, exchanged a series of text messages with NINALOWO, who was using Ninalowo Phone 1.[14] During this exchange:

a.      STOKES wrote: "Did u write a check for $50k?"  NINALOWO responded: "Yes."  STOKES responded: "To who.  On the phone wit chase [Chase Bank]."  NINALOWO responded: "[Individual E].  That account nearly has [no] transactions that is y."

b.      STOKES wrote: "They [a representative of Chase Bank] called to confirm I told them to approve it."  NINALOWO responded: "Ok."  STOKES asked:

---

[14] On or about October 27, 2018, STOKES and NINALOWO traveled from Lagos, Nigeria to Atlanta.  While at U.S. Customs and Border Protection, and at the direction of law enforcement, Customs officials referred STOKES and NINALOWO for secondary screening and seized Stokes Phone 1 from STOKES and Ninalowo Phone 1 from NINALOWO.

Law enforcement officials understand that STOKES was the user of Stokes Phone 1 as follows: first, Stokes Phone 1 was seized from STOKES by Customs officials. Second, during a search of Stokes Phone 1, law enforcement officials found several photographs (selfies) of STOKES, itineraries in her name, and bank account information in her name.  Law enforcement officials understand that NINALOWO was the user of Ninalowo Phone 1 as follows: first, Ninalowo Phone 1 was seized from NINALOWO by Customs officials. Second, during during the course of the review of these phones, law enforcement officials found communications between the devices, with the number for Ninalowo Phone 1 saved on Stokes Phone 1 as "Ken Babes."

"If they ask where the check came from and why what to say?" NINALOWO did not respond to STOKES's question by text.

44. Based on my training and experience and knowledge of the investigation, including the transfer of $1.7 million from Energy Company A to the Second Steno Logistics Account and other accounts associated with STOKES and NINALOWO, I believe that in the above exchange: (a) STOKES advised NINALOWO that Chase Bank had called her (in her capacity as the Second Steno Logistics account holder) to verify the legitimacy of a $50,000 check made payable to Individual E from the Second Steno Logistics Account; (b) NINALOWO confirmed that he had written that check to Individual E and that he had done so from the Second Steno Logistics Account; (c) NINALOWO said that Chase Bank was likely calling STOKES because the Second Steno Account did not have any transactions until he wrote the $50,000 check to Individual E; and (d) because both STOKES and NINALOWO knew that the money was proceeds of a fraudulent scheme, STOKES asked NINALOWO to give her a purportedly legitimate explanation for the source of the illicit funds in the event that Chase Bank representatives asked for one.

45. According to call logs from Stokes Phone 1 and Ninalowo Phone 1, between February 5 and February 7, 2018, STOKES, using Stokes Phone 1, and NINALOWO, using Ninalowo Phone 1, had approximately 53 calls with each other. Based on my training and experience and knowledge of the investigation, including evidence documenting NINALOWO's involvement in withdrawing and receiving fraud proceeds from Energy Company A from the Second Steno Logistics Account, I

believe that, in these calls: (a) NINALOWO answered STOKES's question about what to tell Chase Bank if asked where the money in the Second Steno Logistics Account that funded the $50,000 check to Individual E came from, offering a purportedly legitimate explanation for the source of the illicit funds; and (b) STOKES and NINALOWO discussed the movement of the fraud proceeds from Energy Company A in general.

> iv.　STOKES and NINALOWO Transfer $150,000 in Energy Company A Fraud Proceeds from the Second Steno Logistics Account to Chase STOKES Account, Then Make Cash Withdrawals

46.　In addition to the cash withdrawals from, and check drawn on, the Second Steno Logistics Account, STOKES and NINALOWO also moved the funds fraudulently obtained from Energy Company A to another bank account controlled by STOKES. According to bank records for the Second Steno Logistics Account, on February 5, 2018, STOKES or someone acting under her authority (such as NINALOWO) transferred approximately $150,000 out of the Second Steno Logistics Account to a different account held in STOKES' name at Chase Bank ending in 0725 (the "Chase STOKES Account").

47.　According to bank records for the Chase STOKES Account, on or about February 5, 2018, NINALOWO cashed a cashier's check in the amount of $30,000 made payable to him, by STOKES, from the Chase STOKES Account. NINALOWO endorsed the back of the cashier's check in his own name.

48.　Between on or about February 6 and 12, 2018 – and the February 5 transfer of approximately $150,000 from the Second Steno Logistics Account to the

Chase STOKES Account – NINALOWO performed numerous cash withdrawals from the Chase STOKES Account. Specifically:

      a.      On or about February 6, 2018, at approximately 11:41 a.m., surveillance video of the aforementioned Chase branch in Chicago captured NINALOWO withdrawing approximately $3,000 from the Chase STOKES Account.

      b.      On or about February 11, 2018, at approximately 8:56 a.m., surveillance video of a Chase branch in Chicago captured NINALOWO withdrawing another approximately $500 from the Chase STOKES Account.

      c.      On or about February 12, 2018, at approximately 9:03 a.m., surveillance video of a Chase branch in Chicago captured NINALOWO withdrawing another approximately $3,000 from the Chase STOKES Account.

      49.      Based on my training and experience and knowledge of the investigation – including (a) as discussed above, the July 2016 fraud involving College A and STOKES's receipt and deposit of a check for approximately $398,220 into another Steno Logistics bank account; (b) the creation of the Second Steno Logistics Account three days after the First Steno Logistics Account was setup; (c) the fact that, within 13 days after the initial funds were fraudulently obtained from Energy Company A, STOKES and NINALOWO disbursed almost all of those funds (approximately $1,294,000) from the Second Steno Logistics Account through debit card transactions, checks, withdrawals, and wire transfers, including to other bank accounts controlled by STOKES and NINALOWO (including the Chase STOKES Account and the Yummy Bear Day Care Account); and (d) STOKES's attempted

disbursement of some of the fraudulently obtained funds to a bank account operated by NINALOWO in Nigeria, from which (according to IP login records) the Energy Company B Spoofer Email had connected to the internet – I believe that:

      a.     Either STOKES or an individual acting at her direction registered fictitious companies called "Steno Logistics" and "Yummy Bear Day Care" and opened the Second Steno Logistics Account and Yummy Bear Day Care Account for the purpose of obtaining proceeds fraudulently obtained from Energy Company A and other companies and individuals;

      b.     STOKES and NINALOWO knew that the approximately $1,685,699 that Energy Company A wire transferred into the Second Steno Logistics Account were derived from some form of unlawful activity;

      c.     STOKES registered Steno Logistics, opened the Second Steno Logistics, Chase STOKES, and Yummy Bear Day Care Accounts, and, together with NINALOWO, disbursed almost all of the funds that Energy Company A transferred to the Second Steno Logistics Account (including the deposit of a check in the amount of $180,000 into the Yummy Bear Day Care Accounts, which check was drawn on the Second Steno Logistics Account) in order to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds fraudulently obtained from Energy Company A; and

      d.     NINALOWO used the Second Steno Logistics Account and Chase STOKES Account to withdraw, transfer, and receive fraudulently-obtained funds, including (i) $15,500 in cash that he withdrew from the Second Steno Logistics

Account and Chase STOKES Account, (ii) a $30,000 check made payable to him from the Second Steno Logistics Account; (iii) a $50,000 check that he wrote in STOKES's name and made payable to Individual E; and (iv) an attempted wire transfer of $100,000 from the Yummy Bear Day Care Account (following a $180,000 transfer from the Second Steno Logistics Account) to a bank account in his name in Nigeria; all to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds fraudulently obtained from Energy Company A.

## CONCLUSION

50.     Based on the above information, there is probable cause to believe that, starting no later than in or about June 2016 and continuing until in or about February 2018, at Chicago, in the Northern District of Illinois, Eastern Division, BRITTNEY STOKES and KENNETH NINALOWO engaged in a conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

FURTHER AFFIANT SAYETH NOT.

RALPH RENNO
Special     Agent,     Federal     Bureau     of Investigation

SUBSCRIBED AND SWORN to before me on July 18, 2019.

Susan E. Cox
United States Magistrate Judge